***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties and their representatives. Accordingly, the Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Harris.
 *********** ISSUES
1. Whether Dr. Perdue should be designated as Plaintiff's treating physician?
2. Whether Defendants should be directed to authorize and pay for the treatment that Dr. Perdue recommends for Plaintiff's compensable left knee injury, including but not limited to arthroscopic surgery? *Page 2 
3. Whether Plaintiff is entitled to temporary total disability compensation beginning on or about December 10, 2008?
4. Whether Plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1?
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the Commission has jurisdiction of the parties and of the subject matter of this action.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. On or about October 11, 2008, Defendant-Employer employed more than three employees, and the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
4. On or about October 11, 2008, there existed between Plaintiff and Defendant-Employer an employee-employer relationship.
5. On or about October 11, 2008, Defendant-Employer provided workers' compensation insurance coverage to its employees through Liberty Mutual Insurance Company.
6. On or about October 11, 2008, Plaintiff was employed by Defendant-Employer at an average weekly wage of $1,366.54, resulting in a compensation rate at the 2008 maximum amount of $786.00.
7. Plaintiff sustained a compensable injury by accident to his left knee on or about October 11, 2008. *Page 3 
8. Plaintiff was last employed by Defendant-Employer on or about December 10, 2008.
9. Plaintiff has not received any temporary total, temporary partial, permanent partial or permanent total disability benefits as a result of the October 11, 2008 injury by accident.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Plaintiff's medical records (including post-hearing submissions)
 • Exhibit 3: Industrial Commission Forms and filings
The following document was accepted into evidence as a Plaintiff's exhibit:
 • Exhibit 1: List of medications for Plaintiff's pulmonary condition
The following document was accepted into evidence as a Defendants' exhibit:
 • Exhibit 1: Agreement between Defendant-Employer and union dated 8/1/08
Transcripts of the depositions of the following were also received following the hearing before the Deputy Commissioner:
 • Joan M. Bagley
 • Dr. Max Kasselt
 • Dr. Philip S. Perdue, Jr.
 *********** *Page 4 EVIDENTIARY RULINGS
Following the closing of the record, Plaintiff moved for the record to be re-opened for the receipt of additional medical records. Defendants did not object to said Motion. The Motion was ALLOWED by Deputy Commissioner Harris, and a record and letter dated November 17, 2009 from Orthopaedics East was considered as part of the evidence. The Full Commission affirms this ruling evidentiary ruling by Deputy Commissioner Harris.
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff is 64 years old, with a date of birth of May 13, 1946. He graduated from high school and has taken some community college courses. From 1965 until January 5, 2009, he worked with Defendant-Employer and its predecessor Weyerhaeuser Corporation.
2. At the time Plaintiff sustained his compensable left knee injury in this claim, Plaintiff's job title was senior mechanic, and he was working as a lubrication engineer in Defendant-Employer's Plymouth, North Carolina plant. In that job, he ensured that all the machines had oil. He had to climb ladders, bend, stoop, squat, and constantly walk.
3. Plaintiff developed reactive airways disease as the result of a compensable work-related incident in about 1981, and he also sustained a compensable injury to his neck in 1996. He continues to receive medical treatment for these conditions, and, because of his lung condition, he was having to limit his work as much as reasonably possible to climate-controlled, clean environments as of the date of injury in this claim. Defendant-Employer for the most part accommodated these requirements. *Page 5 
4. On October 11, 2008, Plaintiff sustained a compensable left knee injury when he slipped on dust on the floor and fell on his left knee.
5. Following his injury, Plaintiff continued actively working with Defendant-Employer through December 6, 2008, doing his regular pre-injury job while taking pain-killers.
6. Defendants sent Plaintiff for evaluation and treatment with Dr. Kasselt, the orthopedist to whom Defendant-Employer's employees are typically sent for work-related injuries.
7. Plaintiff initially saw Dr. Kasselt on November 24, 2008. Dr. Kasselt noted marked effusion as well as pre-existing degenerative joint disease in the left knee. He recommended aspiration of fluid from the knee and a cortisone injection. Plaintiff did not wish to pursue that plan, in part because he was concerned a cortisone injection would cloud an MRI, which he wanted to undergo. Although Dr. Kasselt acknowledged it would have been the "standard of practice" to order an MRI at that point, he did not want to do so.
8. Plaintiff told Dr. Kasselt that he wanted to see another orthopedist, Dr. Perdue. Plaintiff told Dr. Kasselt that he wanted to go to Dr. Perdue because Plaintiff had seen him in the past for unrelated problems and he was familiar with Plaintiff's pulmonary condition. Dr. Kasselt thus referred Plaintiff to be evaluated with Dr. Perdue.
9. Plaintiff went to see Dr. Perdue later that same day, November 24, 2008. Dr. Perdue noted effusion with tenderness and pain with flexion of the left knee, and he recommended an MRI to confirm a likely meniscus tear.
10. On November 25, 2008, Plaintiff underwent an MRI, which confirmed a torn medial meniscus with tri-compartment osteoarthritis, mucoid degeneration involving the posterior cruciate ligament, and effusion. *Page 6 
11. On December 6, 2008, Plaintiff was leaving Defendant-Employer's facility when a trailer he was pulling behind his vehicle was searched and found to contain parts, pumps and materials belonging to Defendant-Employer and valued at about $18,000. As Plaintiff did not have a removal pass for the materials, he was suspended pending an investigation.
12. On December 10, 2008, Plaintiff returned to Dr. Perdue with continued left knee pain. Dr. Perdue recommended an arthroscopic meniscectomy and wrote Plaintiff entirely out of work for an undetermined period of time pending surgery. Dr. Perdue has not released Plaintiff to return to work in any capacity since December 10, 2008.
13. On January 5, 2009, Defendant-Employer terminated Plaintiff for the December 6, 2008 incident for which a non-injured employee would also have been terminated.
14. On January 7, 2009, Plaintiff filed a Motion with the Commission seeking a change of physician to Dr. Perdue. Special Deputy Commissioner Christopher B. Rawls filed an Order on January 29, 2009 denying the Motion and directing Defendants to authorize a return appointment with Dr. Kasselt. The Order also noted that, if the parties were unable to agree upon the course of Plaintiff's treatment following the return evaluation with Dr. Kasselt, Plaintiff could file a new Motion.
15. Pursuant to the January 29, 2009 Order, Plaintiff presented to Dr. Kasselt on March 23, 2009. At this appointment, Plaintiff did not prevent Dr. Kasselt from physically examining his left knee and told Dr. Kasselt it was "up to him" as to whether he wanted to examine the knee. However, Dr. Kasselt took Plaintiff's conduct as a refusal to allow an examination. Based upon the greater weight of the evidence, the undersigned find that Plaintiff did not refuse an examination with Dr. Kasselt and substantially complied with the January 29, 2009 Order. *Page 7 
16. At the March 23, 2009 appointment, upon viewing Plaintiff's left knee, Dr. Kasselt noted that the knee appeared swollen and that he had likely torn his meniscus in the October 11, 2008 incident. Following review of Dr. Perdue's notes and the MRI results, Dr. Kasselt recommended that Plaintiff go ahead and have a total knee replacement, because he felt that a meniscectomy would not improve Plaintiff's left knee symptoms and he would likely need the total knee replacement eventually anyway. However, Dr. Kasselt also noted that the meniscectomy alone could work, and he did not criticize Dr. Perdue's recommendation. He also indicated that Plaintiff should undergo any surgery in a hospital setting, rather than on an outpatient basis, because of his pulmonary condition.
17. On March 23, 2009, Dr. Kasselt noted that Plaintiff had been using a wheelchair for three weeks. He noted that Plaintiff was unable to perform his job duties and restricted Plaintiff to sedentary work in a wheelchair.
18. Plaintiff returned to Dr. Perdue on April 7, 2009 and June 15, 2009 with continued left knee pain. Dr. Perdue noted that Plaintiff's left knee condition was related to the October 11, 2008 incident and again recommended a meniscectomy as the best treatment option. At the April 7, 2009 visit, Dr. Perdue did a cortisone injection, which did not provide significant relief.
19. On March 25, 2009, Plaintiff filed another Motion for a change of physician to Dr. Perdue. In response, Defendants sought an order directing Plaintiff either to return to Dr. Kasselt or to see Dr. Kobs or another third physician to be chosen by Defendants. Special Deputy Commissioner Rawls filed an Order on April 7, 2009 denying Plaintiff's Motion in the administrative forum and noting that, if the parties remained unable to agree upon continued *Page 8 
treatment with Dr. Kasselt, Dr. Kobs or another physician upon whom the parties could agree, then Plaintiff could file a Form 33 Request for Hearing.
20. At the hearing before Deputy Commissioner Harris, Defendants' Motion for an evaluation with a third physician of their choice was denied.
21. As of the hearing before the Deputy Commissioner, Plaintiff still had severe pain in his left knee and was in a wheelchair. He was using a cane and/or walker whenever he walked, and he was wearing a brace on his left knee.
22. Plaintiff wants Dr. Perdue to do any surgery on him because he has had surgery twice before with Dr. Perdue for other conditions and because he feels Dr. Perdue is familiar with his lung condition and is located close to the physicians who have treated his lung condition.
23. Defendant-Employer has a "light-duty committee" that meets, pursuant to the collective bargaining agreement with the union, to determine whether employees with work restrictions can be accommodated in Defendant-Employer's operation. If an employee were taken entirely out of work, the committee would not meet to discuss him. Kelvin Outlaw, the safety and security manager at the plant since 2001, was not aware of any employee who was wheelchair-bound ever having been accommodated.
24. Dr. Kasselt testified that, in his experience, patients with Plaintiff's obesity, age and arthritic knees do not typically have good results from arthroscopic surgery and that, no matter what, Plaintiff will likely need a left total knee replacement in the future. As such, he recommended that Plaintiff skip an arthroscopy and go right ahead with a total knee replacement, which would also serve to save one operation and reduce Plaintiff's exposure to blood clots and other serious complications. *Page 9 
25. Dr. Kasselt testified that, because he felt Plaintiff and his wife were difficult and obstructive, he would never treat Plaintiff again. He also stated that, regardless of whether he had physically examined Plaintiff at the March 23, 2009 appointment, it would not have changed his treatment recommendation.
26. Dr. Perdue specializes in knees and shoulders. Regarding Dr. Kasselt's concern over doing an arthroscopy on an arthritic knee, Dr. Perdue allowed that arthroscopy in arthritic knees was "controversial," but he noted that Plaintiff has worse arthritis in his right knee and that his right knee does not seem to bother him. Dr. Perdue disagreed with Dr. Kasselt's opinion that arthroscopy is not advisable on an arthritic knee, noting that, in his considerable experience, moderately arthritic knees still have about a 70 to 80 percent change of improvement with arthroscopies.
27. Dr. Perdue believed that an arthroscopic meniscectomy was worthwhile because it is minimally invasive and relatively low-risk and does not "burn any bridges." As Dr. Perdue stated, if it does not work, then Plaintiff can undergo the total knee replacement. Dr. Perdue also noted that a total knee replacement has a much higher complication rate than does an arthroscopic meniscectomy.
28. Dr. Perdue agreed that any surgery Plaintiff undergoes would probably have to involve hospitalization because of Plaintiff's lung condition.
29. Dr. Perdue confirmed that he believed that the treatment plan he has recommended for Plaintiff's left knee condition is reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability. *Page 10 
30. The Full Commission gives greater weight to the testimony of Dr. Perdue than to that of Dr. Kasselt. Dr. Perdue has seen Plaintiff more often and is a knee specialist. Dr. Kasselt is the company doctor, and his antagonism toward Plaintiff is palpable in the record.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to his left knee on or about October 11, 2008 while employed with Defendant-Employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff is entitled to have Defendants provide him with further medical treatment for his compensable left knee condition. N.C. Gen. Stat. §§ 97-2(19); 97-25.
3. Plaintiff is entitled to have Dr. Perdue designated as his authorized treating physician in this claim, and Defendants should authorize and pay for the treatment that Dr. Perdue recommends for Plaintiff's compensable left knee condition, including but not limited to the arthroscopic meniscectomy and the attendant hospitalization. N.C. Gen. Stat. § 97-25.
4. Plaintiff is entitled to have Defendants pay for the medical treatment he has heretofore received for his compensable left knee condition. Id.
5. On January 5, 2009, Plaintiff was terminated for misconduct and fault, unrelated to his compensable injury, for which a non-disabled employee would ordinarily have been terminated by Defendant-Employer. Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E. 2d 397 (1996). Accordingly, Plaintiff's termination constituted a constructive refusal of suitable employment. N.C. Gen. Stat. § 97-32. *Page 11 
6. Under the Seagraves analysis, after an employer has proven that the employee's termination constitutes a constructive refusal of employment, an employee must then show that her inability to find other employment at wages comparable to those earned prior to the injury is due to the work-related disability. Seagraves v. AustinCo. of Greensboro, supra.
7. However, in the case at bar, the greater weight of the evidence shows that Plaintiff is medically unable to work in any employment because of his compensable left knee condition. Demery v. PerdueFarms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993). Plaintiff has shown that his inability to find of hold other employment of any kind is due to his compensable injury. Id. Even if Dr. Kasselt's sedentary/wheelchair restriction is used, it would be futile for Plaintiff to seek employment suitable to his restriction, given his limited educational and vocational background. Id. Further, Defendants have not shown that suitable light-duty employment would be available with Defendant-Employer but for Plaintiff's termination. As such, Plaintiff is entitled to receive temporary total disability compensation beginning on December 10, 2008 and ongoing until further order of the Commission. N.C. Gen. Stat. § 97-29.
8. Defendants have defended this claim with reasonable grounds, particularly given the Commission's earlier Orders. As such, Plaintiff is not entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1.
 ***********
Based on the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission makes the following award:
 AWARD *Page 12 
1. Subject to the attorney's fee provision below, Defendants SHALL make a lump sum payment of back-owed temporary total disability compensation to Plaintiff in the amount of $786.00 per week for the period from December 10, 2008 through the present. Defendants SHALL also continue to make weekly total disability compensation payments to Plaintiff in the amount of $786.00 per week until Plaintiff returns to work or further Order of the Commission.
2. As Plaintiff's attorney's fee, Defendants SHALL deduct 25 percent of the lump sum amount payable per Paragraph 1 above and pay said portion directly to Plaintiff's counsel. Defendants SHALL also make every fourth ongoing weekly total disability compensation check payable directly to Plaintiff's counsel.
3. Dr. Perdue IS HEREBY DESIGNATED as Plaintiff's authorized treating physician, and, subject to the limitations period of N.C. Gen. Stat. § 97-25.1, Defendants SHALL authorize and pay for the treatment that Dr. Perdue recommends for Plaintiff's compensable left knee condition, including but not limited to surgery, hospitalization, diagnostic testing and imaging, physical therapy, prescriptions, referrals and mileage.
4. To any extent they have not already done so, Defendants SHALL pay for the treatment that Plaintiff has heretofore received for his compensable left knee condition, including but not limited to that he has received with and/or at the direction of Drs. Kasselt and/or Perdue and including diagnostic testing and imaging, injections, prescriptions and mileage. If Plaintiff and/or any third-party payor has paid for any such treatment, Defendants SHALL reimburse such payor in full.
5. Defendants shall pay the costs. As part of their costs, if they have not done so already, Defendants shall pay an expert witness fee to Dr. Perdue in the amount of $551.00 or the amount actually billed, whichever is less. *Page 13 
This the 2nd day of June 2010.
 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/___________________ DANNY L. McDONALD COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1